IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Barbara Sims Adams, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>Carolyn W. Colvin, )<br>Commissioner of Social Security, )<br>)<br>Defendant. )<br>_____ ) | Civil Action No. 6:14-460-DCN-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

This case is before the court for a report and recommendation pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits under Title II of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed an application for disability insurance benefits ("DIB") on April 11, 2011, alleging that she became unable to work on September 14, 2010. The application was denied initially and on reconsideration by the Social Security Administration. On February 29, 2012, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Jane Colvin-Roberson, M.S., an impartial vocational expert, appeared at a video hearing on July 24, 2013, considered the case *de novo* and, on August 8, 2013, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the

Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on December 20, 2013.  The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1)    The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.
>
> (2)    The claimant has not engaged in substantial gainful activity since September 14, 2010, the alleged onset date (20 C.F.R §§ 404.1571 *et seq*).
>
> (3)    The claimant has the following severe impairments: lumbar disc disease; cervical disc disease; cardiovascular disease; diabetes mellitus; history of renal stones (20 C.F.R. § 404.1520(c)).
>
> (4)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).
>
> (5)    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) except she cannot climb ladders, ropes, or scaffolds; she can occasionally climb ramps/stairs, balance, stoop, crouch, kneel and crawl; she must avoid concentrated exposure to extreme cold, heat, humidity, pulmonary irritants and hazards.
>
> (6)    The claimant is unable to perform any past relevant work (20 C.F.R. § 404.1565).
>
> (7)    The claimant was born on December 4, 1963, and was 46 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. § 404.1563).
>
> (8)    The claimant has a limited education and is able to communicate in English (20 C.F.R. § 404.1564).
>
> (9)    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has

transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(10) Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569 and 404.1569(a)).

(11) The claimant has not been under a disability, as defined in the Social Security Act, from September 14, 2010, through the date of this decision (20 C.F.R. § 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing

3

substantial gainful employment.   20 C.F.R. § 404.1520.   If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).  He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy.   The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments that prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).   Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).   The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff began treatment at the Arthritis Clinic and Carolina Bone & Joint in 2003. She sought treatment for neck pain, due to a bulging disc at C6-76 with left upper extremity radiculopathy (Tr. 329-30). The plaintiff received three epidural injections (Tr. 327). Seth Jaffe, M.D., indicated that the plaintiff had a history of a herniated cervical disc at the C6-7 level with left nerve root compression (Tr. 323).

On October 9, 2003, Ramesh M. Sharma, M.D., performed an angiography, which revealed critical preocclusive stenosis of the right common iliac artery. The plaintiff received a stent to both iliac arteries (Tr. 379-85). On December 10, 2003, Aamar Qureshi, M.D., performed a left heart catheterization, selective coronary arteriography, left ventriculography, and an abdominal aortogram (Tr. 423-26).

In 2004, the plaintiff continued treatment for neck and left arm pain. An MRI from January 14, 2004, showed cervical spondylosis and degenerative disc disease at C6-7 with a bulging disc (Tr. 320).

On March 11, 2004, Dr. Qureshi saw the plaintiff for chest pain and shortness of breath. She was diagnosed with atherosclerotic cardiovascular disease and known peripheral vascular disease. She had an underlying anxiety disorder and was prescribed Xanax (Tr. 355). An ultrasound on September 1, 2004, showed substantial compromise of the right lower extremity circulation. The plaintiff had significant symptoms with

weakness and numbness in the right lower extremity due to a severe in-flow compromise on the right side (Tr. 351-56). On September 8, 2004, the plaintiff underwent aortoiliac angiography and bilateral common iliac dilations (Tr. 420-22).

In 2008, Neal M. Goldberger, M.D., of Carolina Bone & Joint, indicated that the plaintiff had undergone anterior cervical discectomy and returned to the clinic with low back pain. She had lumbar disc bulging at L4-5 and L5-S1. The plaintiff was diagnosed with lumbar and cervical nerve root irritation with radicular pain (Tr. 592). On November 4, 2008, the plaintiff underwent bilateral sacroiliac joint injections and a trigger point injection of her left trapezius muscle (Tr. 588-89).

The plaintiff was seen six times in 2009 for pain in her left shoulder, her lower back, and her right leg. She underwent repeat caudal steroid injections. She had positive straight leg raise tests. Hydrocodone, Neurontin, Soma, and Tramadol were prescribed (Tr. 576-86).

On January 5, 2010, the plaintiff had neck and lower back pain that radiated to her shoulders and her left leg. She had a flare-up of her cervical nerve root irritation. She underwent a cervical epidural steroid injection (Tr. 574-75). On March 2, 2010, the plaintiff had lower back pain with a positive straight leg raise test on the left (Tr. 572). On April 13, 2010, the plaintiff continued with neck and back pain that radiated to her thighs. She received another cervical injection (Tr. 570). On May 21, 2010, the plaintiff was seen for cervical and lumbar nerve root irritation. She received a caudal steroid injection and bilateral sacroiliac joint injections. The physician noted that she walked with a walker and had essentially been bedridden (Tr. 568-69). On June 1, 2010, the plaintiff had lower back pain and bilateral sacroiliac joint inflammation (Tr. 567). On August 17, 2010, the plaintiff had neck pain with radiation. She had myofascial tenderness to palpation (Tr. 560). On October 12, 2010, the plaintiff received another cervical epidural steroid injection due to neck pain that radiated to her right shoulder and arm (Tr. 558).

6

On February 15, 2011, the plaintiff saw N. Perera, M.D., for wheezing. She had a tender back (Tr. 540).

The plaintiff was seen six times in 2011 for back, neck, and coccyx pain. She received cervical epidural steroid injections and was prescribed Norco, Soma, and Percocet, and her Neurontin dosage was increased (Tr. 546-56). Dr. Goldberger's impression was cervical nerve root irritation and lumbar nerve root irritation, both of which were noted to be under excellent control on July 11, 2011; lumbar disc bulging at L4-5 and L5-S1; and coccydynia (Tr. 546-59, 774). A lower extremity arterial study dated September 1, 2011, revealed normal bilateral ankle brachia indices (Tr. 519). Otherwise, physical examinations were consistently unremarkable. The plaintiff consistently had good flexion, extension, and side rotation of the neck. There was no tenderness over the cervical facets to palpation. Spurling's sign was negative bilaterally. The plaintiff had good and equal strength throughout both upper extremities. Sensation remained intact throughout both lower extremities. Deep tendon reflexes were 2+ and intact for both patellae (Tr. 546-59, 668-73). Straight-leg raise was negative bilaterally, except for one occasion in June 2011 when the plaintiff had a positive straight leg raise on the right (Tr. 554). The plaintiff was also seen in January and March 2012, at which time she reported that injections helped her pain (Tr. 668-73).

On February 3, 2012, state agency medical consultant Carl Anderson, M.D., opined in a physical residual functional capacity ("RFC") assessment that the plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, and walk, sit, stand about six hours. She could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. She should avoid concentrated exposure to extreme cold, extreme heat, humidity, fumes, odors, dusts, gases, poor ventilation, and hazards (Tr. 634-37).

On March 13, 2012, the plaintiff reported that she had been diagnosed with diabetes and a right kidney stone (Tr. 668).  She also stated that she was applying for disability (Tr. 668).

On May 8, 2012, Dr. Goldberger completed a Medical Source Statement (Tr. 674-78).  He opined that the plaintiff could sit for two hours and stand/walk for one hour per day, but would need an opportunity to alternate sitting and standing at will throughout the day (Tr. 674).  Dr. Goldberger opined that the plaintiff could lift and carry up to five pounds frequently and up to ten pounds occasionally.  He indicated that the plaintiff could never climb, balance, stoop, kneel, crouch, crawl or reach above shoulder level (Tr. 675).  Dr. Goldberger noted the pain experienced by the plaintiff would prevent her from performing full-time work at even the sedentary position (Tr. 676).  Dr. Goldberger indicated that there was evidence of nerve root compression characterized by neuroanatomic distribution of pain and limitation of motion of the spine.  The plaintiff had painful dysesthesias and needed to change position or posture more than once every two hours.  Her lumbar and cervical spinal stenosis was established by her MRI from July 14, 2006 (Tr. 674-80).  In support of his opinion, Dr. Goldberger attached 2006 MRI reports revealing minimal spondylosis at C4-5 and C5-6; C6-C7 spondylotic bulge contacting the cord; posterior bulging at L5-S1; and a slight annular bulge at L4-5 (Tr. 679-80).

On May 30, 2012, the plaintiff underwent surgery for kidney stones (Tr. 653-66, 681-707).

On July 10, 2012, Dr. Goldberger noted that the plaintiff had her kidney stone removed with restoration of kidney function.  The plaintiff complained of some discomfort across her lower back with some discomfort in her coccyx region.  Examination was unremarkable.  The plaintiff had continued to have good flexion, extension, and side rotation of the lumbar spine.  There was no evidence of myofascial tenderness along the lumbar paravertebral or gluteus medius musculature.  There was no significant facet

8

tenderness along both lumbar facets. There was no tenderness over either sacroiliac joint to palpation. The plaintiff had good strength throughout both lower extremities. Sensation was intact throughout both lower extremities. Deep tendon reflexes were 2+ and intact for both patellae. Straight-leg raise was negative bilaterally. On the date of the visit, Dr. Goldberger held off on prescribing narcotics. He requested a release from the plaintiff's urologist stating that he would no longer prescribe narcotics for the plaintiff. Dr. Goldberger noted that once he received the release, he would issue a prescription for hydrocodone. In the meantime, he renewed prescriptions for Soma and Neurontin and instructed the plaintiff to return in eight weeks (Tr. 772). On August 20, 2012, the plaintiff had lower back pain and she underwent bilateral sacroiliac joint injections (Tr. 770).

On October 15, 2012, the plaintiff reported that her back was better and her neck was doing fairly well. She had continued pain in her legs. She stated that her pain was five on a pain scale to ten (Tr. 768). Except for occasional myofascial tenderness along the cervical and lumbar paravertebral muscles, trapezius muscles bilaterally, and over the sacroiliac joints to palpation, physical examination findings remained unchanged (Tr. 762-71). On December 10, 2012, the plaintiff reported significant discomfort across her lower back (Tr. 766).

On January 24, 2013, the plaintiff was seen by Dr. Perera and was started on medication for peripheral vascular disease. She was also seen for a check of her diabetes and blood sugar. Her numbers had not reached desirable levels. She had foot pain. She did not have financial means to see a vascular surgeon (Tr. 777).

On February 6, 2013, the plaintiff was seen by Leslie Ware, PA-C, at Carolina Bone and Joint, for chronic pain associated with cervical and lumbar nerve root irritation (Tr. 764). On April 3, 2013, the plaintiff had tenderness to the cervical paravertebral muscles, trapezius muscles, and both sacroiliac joints. The plaintiff had good flexion, extension, and

side rotation of the lumbar spine and good and equal strength and intact sensation in both lower extremities. Straight leg raise test was positive bilaterally (Tr. 762).

On May 22, 2013, the plaintiff was seen by cardiologist Deepak B. Shah, M.D., for chest pain. She reported aching of extremities, cramping, pain, and weakness of extremities, particularly in her calves and thighs. The pain worsened with ambulation, and it was accompanied by shortness of breath (Tr. 783-84).

### Hearing Testimony

The plaintiff testified that she completed the seventh grade. She was able to read and write. She had primarily worked in textile, manufacturing, restaurant, and grocery store work. She testified that she could not work because of her legs and her back. She could not walk or drive very far. The last time she drove, her legs hurt for two days. She woke up in the middle of the night with pain. Her husband had to rub her legs because they hurt so intensely. She had to take sleeping pills because of the pain (Tr. 34-36).

The plaintiff testified that in a typical day she got up and watched television and drank her coffee. She asked her grandson to feed her cats. She fixed instant grits or waffles for breakfast. She sat back down and let her grandson watch cartoons. She took medications. Her back hurt when she woke up, so she took pain medication for her back. Her medication made her drowsy and dizzy so she took a nap. She tried to cook supper, and her daughter helped. Her daughter stayed at home to help her because she could not sweep or mop. The plaintiff could do the dishes as long as she could sit back down. She could not stand up and cook a whole meal, but she could put food in the crock pot for supper. During the day she read and watched TV (Tr. 36-38).

In response to the attorney's questions during the hearing, the plaintiff reported that her most limiting condition was walking. Walking was limited because she had very small arteries. The doctor told her they were the size of a child's. She did not have blood flow, so her legs were weak. She also had diabetes, and her foot doctor told

her that he could not find a pulse in her feet.  The plaintiff wore compression stockings, which were prescribed by Dr. Sharma.  She had experienced ankle swelling.  She thought the swelling would go down when she quit working, but it did not.  Her legs would swell after walking to the kitchen to fix coffee and returning to sit down.  She elevated her legs at home, and she had a recliner in the bedroom for that reason.  The plaintiff did not usually go to the grocery store; she sent her daughter instead.  She could go herself if her legs were not swollen and hurting. She took Metformin for her diabetes.  The plaintiff had problems with her kidneys and with her eyesight due to the diabetes.  She had undergone surgery on her right kidney, and now her left kidney was acting up the same way.  She did not have insurance to return to the kidney doctor (Tr. 38-41).

The plaintiff testified that her past work all required manual labor, and she worked at least 40 hours a week.  She stated that she would no longer be able to sustain physical activity for eight hours day because she could not stand up for even an hour at a time without her legs swelling and hurting.  The plaintiff reported that in between tasks at home she had to sit down.  She did not stay up on her legs any longer than she had to. The plaintiff was also limited in how much she could lift due to her back pain.  She could pick up a ten pound bag of flour, but she could not carry it very far.  The plaintiff had also had an injection for her coccyx pain, but she was unable to pay for a second injection.  She did not have health insurance (Tr. 42-44).

### Vocational Expert

The vocational expert ("VE") classified the plaintiff's past work as that of waitress, light, SVP of 3, semi-skilled; warehouse worker, medium, SVP of 2, unskilled; forklift operator, medium, SVP of 2, unskilled; machine operator in the textile industry, medium, SVP of 3, semi-skilled; and cashier, light, but medium as it was performed, SVP of 3, semi-skilled (Tr. 45-46).

The VE testified in response to a series of hypothetical questions, one of which concerned an individual of the plaintiff's age and education who could perform light work with additional limitations, including never climbing ladders, ropes, or scaffolds; occasionally climbing ramps/stairs, balance, stoop, crouch, kneel and crawl; and no concentrated exposure to extreme cold, extreme heat, pulmonary irritants, and hazards (Tr. 45).  The VE testified that the hypothetical individual could not perform the plaintiff past relevant work but could perform work that existed in significant numbers in the national economy, including the representative occupations of assembler, hand packager, and ticket taker (Tr. 46-47).

## ANALYSIS

The plaintiff argues that the ALJ erred by (1)  failing to properly assess the medical opinions, and (2)  failing to explain his findings regarding her RFC.

### Medical Opinions

The plaintiff first argues that the ALJ erred in discounting the opinion of treating physician Dr. Goldberger (pl. brief 16-20).  The regulations require that all medical opinions in a case be considered, 20 C.F.R. § 404.1527(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3)  the nature and extent of the treatment relationship; (4)  the evidence with which the physician supports his opinion; (5)  the consistency of the opinion; and (6)  whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* § 404.1527(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). However, statements that a patient is "disabled" or "unable to work" or similar assertions are not medical opinions.   These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 404.1527(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5. As stated in SSR 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

On May 8, 2012, Dr. Goldberger completed a Medical Source Statement (Tr. 674-78). He opined that the plaintiff could sit for two hours and stand/walk for one hour per day, but would need an opportunity to alternate sitting and standing at will throughout the day (Tr. 674). Dr. Goldberger opined that the plaintiff could lift and carry up to five pounds frequently and up to ten pounds occasionally. He indicated that the plaintiff could never climb, balance, stoop, kneel, crouch, crawl or reach above shoulder level (Tr. 675). Dr. Goldberger noted the pain experienced by the plaintiff would prevent her from performing full-time work at even the sedentary position (Tr. 676). Dr. Goldberger indicated that there was evidence of nerve root compression characterized by neuroanatomic distribution of pain and limitation of motion of the spine. The plaintiff had painful dysesthesias and needed to change position or posture more than once every two hours. Her lumbar and cervical spinal stenosis was established by her MRI from July 14, 2006 (Tr. 674-80). In support of his opinion, Dr. Goldberger attached 2006 MRI reports revealing minimal spondylosis at C4-5 and C5-6; C6-C7 spondylotic bulge contacting the cord; posterior bulging at L5-S1; and a slight annular bulge at L4-5 (Tr. 679-80).

The ALJ gave little weight to Dr. Goldberger's opinion that the plaintiff met Listing 1.04(A) or (C), "as there is no objective medical evidence of limited spine range of motion or motor and sensation loss.  In fact, physical examinations consistently reveal normal range of motion of the cervical and lumbar spine, normal sensation, as well as negative straight leg raising tests."  The ALJ stated that there was also no evidence of weakness or inability to ambulate effectively; "[r]ather, the [plaintiff] is consistently noted to have normal muscle strength in her upper and lower extremities."  The ALJ also noted that "the record documents no abnormalities of the [plaintiff's] gait or station" (Tr. 17-18).  Later in the decision, in the RFC assessment, the ALJ gave little weight to Dr. Goldberger's opinion regarding the plaintiff's functional limitations, stating that the opinion was inconsistent with Dr. Goldberger's own treatment notes showing that the plaintiff was doing well and had good range of motion, strength, and sensation with negative straight leg raise tests.  The ALJ further found that the opinion was inconsistent with the other evidence of record and with the conservative treatment prescribed by Dr. Goldberger (Tr. 19).

The plaintiff argues that the ALJ selectively discussed evidence that was favorable to his RFC determination[1] and failed to discuss evidence that supported Dr. Goldberger's opinion (pl. brief 17-20).  The undersigned disagrees.  As noted by the Commissioner, five of the seven treatment notes showing positive straight leg raise tests that are cited by the plaintiff as being ignored by the ALJ predate the alleged onset date of September 14, 2010 (see pl. brief (citing Tr. 568 (5/21/10), 570 (4/13/10), 572 (3/2/10), 578 (8/18/09), 580 (7/21/09)).  Although Dr. Goldberger's treatment notes documented occasional tenderness over the sacroiliac joints and coccyx and myofascial tenderness along the cervical paravertebral and trapezius muscles, physical examinations were otherwise consistently unremarkable.  The plaintiff consistently had good flexion, extension,

_____

[1]The plaintiff does not argue that her impairments meet or medically equal Listings 1.04(A) or (C).

14

and side rotation of the neck and lumbar spine. There was no tenderness over the cervical facets to palpation. Spurling's sign was negative bilaterally. The plaintiff had good and equal strength throughout both upper extremities, and sensation remained intact throughout both lower extremities. Deep tendon reflexes were 2+ and intact for both patellae. At numerous office visits between October 2010 and April 2013, straight-leg raise was negative bilaterally except for one positive straight leg raise on the right in June 2011 and one positive test bilaterally in April 2013 (Tr. 546-59, 668-73, 762-74). On July 11, 2011, Dr. Goldberger noted that the plaintiff's cervical nerve root irritation and lumbar nerve root irritation were both under excellent control (Tr. 552).

Further, the ALJ noted that the conservative treatment course prescribed by Dr. Goldberger was inconsistent with a finding of debilitating impairments (Tr. 19). The record shows that the plaintiff was treated with pain medication and steroid injections, which the ALJ noted the plaintiff "reported provide[d] significant pain relief (Tr. 19; *see* Tr. 546-49, 668-73, 762-74). The plaintiff finds error with the ALJ's citation of a treatment note from January 2012 that stated the plaintiff "underwent injection of her coccyx and states this really helped her pain" (pl. brief 18 (citing Tr. 671)). The plaintiff argues that she "does not submit that her coccyx pain is what prevents her from working, and the improvement of her coccyx pain would be irrelevant to the discussion of whether or not she had 'significant improvement' of the disabling pain she alleges related to her neck and back condition" (pl. brief 18). The ALJ must consider the plaintiff's severe and nonsevere impairments in combination in determining the plaintiff's disability, and, "[a]s a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). The undersigned finds no error in the ALJ's consideration of the conservative treatment of the plaintiff's coccyx pain in his consideration of the plaintiff's back issues in the RFC assessment. Furthermore, this same treatment note also stated that the plaintiff "continues to do well with the hydrocodone . .

15

. for the low back and neck pain," which would also be relevant to the ALJ's discussion of the relief the plaintiff received from "conservative treatment consisting of pain medication and steroid injections" (Tr. 19). The plaintiff further argues that the ALJ erred in referencing her "significant pain relief" on July 11, 2011, without considering her subsequent report of back and loin pain on July 19, 2011 (pl. brief 18 (citing Tr. 538, 552)). The undersigned finds no error as the ALJ considered the plaintiff's presentation "on multiple occasions with complaints of pain in her neck and lower back with radiation into her lower extremities" (Tr. 18-19). The pain relief the plaintiff received from injections and medication was an appropriate consideration in the ALJ's evaluation of Dr. Goldberger's opinion and the RFC assessment. *See* 20 C.F.R. §§ 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion."), 404.1527(c)(4) (stating an ALJ must consider whether an opinion is consistent with the record as a whole).

The plaintiff also contests the weight given by the ALJ to the opinion of state agency physician Dr. Anderson, who opined that the plaintiff could perform light work with additional limitations (pl. brief 21; *see* Tr. 633-40). The ALJ gave Dr. Anderson's opinion "great weight" as it was "consistent with the minimal objective findings and conservative treatment course" (Tr. 18). The ALJ was required to consider the state agency physician assessment as opinion evidence. *See* 20 C.F.R. § 404.1527(e)(2)(i) ("State agency medical and psychological consultants . . . are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation. Therefore, administrative law judges must consider findings and other opinions of State agency medical and psychological consultants . . . as opinion evidence, except for the ultimate determination about whether you are disabled."). Here, Dr. Anderson's opinion was supported by the unremarkable physical findings and conservative treatment discussed

16

above, and the undersigned finds no error in the weight given to the opinion by the ALJ. *See* SSR 96-6p, 1996 WL 374180, at *3 ("In appropriate circumstances, opinions from State agency medical . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining sources."); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir.1984) ("[T]he testimony of a non-examining, non-treating physician should be discounted and is not substantial evidence when totally contradicted by other evidence in the record. . . . [W]e have also ruled that the testimony of a non-examining physician can be relied upon when it is consistent with the record.") (citations omitted).

The plaintiff further argues that Dr. Anderson's opinion should not have been given great weight because it "was written prior to a diagnosis of diabetes and prior to [the plaintiff's] history of renal stones, both of which the ALJ considered to be severe impairments" (pl. brief 21 (citing Tr. 17)). However, an ALJ may rely on a medical source opinion that did not have access to the entire medical record, so long as the ALJ considered the entire evidentiary record and substantial evidence supports the ALJ's decision. *Thacker v. Astrue*, No. 11-246, 2011 WL 7154218, at *6 (W.D.N.C. Nov. 28, 2011), *adopted by* 2012 WL 380052 (W.D.N.C. Feb. 6, 2012). On March 13, 2012, the plaintiff reported that she had been diagnosed with diabetes and a right kidney stone (Tr. 668). Dr. Anderson's opinion was written in February 2012 (Tr. 633-40). While Dr. Anderson did not have access to the records regarding the diabetes diagnosis or history of kidney stones, the ALJ specifically considered these impairments, and substantial evidence supports his findings that, while these impairments were severe, they did not further limit the plaintiff's RFC (Tr. 18-19). In making the RFC finding, the ALJ noted that the record showed the plaintiff underwent surgery to have a kidney stone removed in May 2012, and her kidney function was restored following the surgery (Tr. 19; *see* Tr. 687-89, 772). The ALJ also considered the plaintiff's diabetes diagnosis and elevated glucose and hemoglobin A1C tests (Tr. 19; *see* Tr. 664-65, 777, 780). The plaintiff has not stated how

these impairments limit her functional abilities, and there is nothing in the medical record relating to the plaintiff's diabetes and kidney stones that suggests limitations beyond the RFC determination.  Based upon the foregoing, the undersigned finds no error in this regard.

In reviewing a Commissioner's decision, reviewing district courts "do not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Craig*, 76 F.3d at 589.  *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (Section 405(g) precludes *de novo* review, and requires a court to uphold the Commissioner's decision "even should the court disagree with such decision as long as it is supported by 'substantial evidence.'").  Based upon the foregoing, the ALJ's consideration of the medical opinions is based upon substantial evidence and is without legal error.

### Residual Functional Capacity

The plaintiff argues that the ALJ's RFC analysis does not rest on substantial evidence and that it was not adequately explained (pl. brief 22-25).  Specifically, the plaintiff argues that the RFC finding includes no significant restriction relating to the ability to sit, stand, or walk (pl. brief 24).  As set forth above, the ALJ determined that the plaintiff had the RFC to perform light work with no climbing or ladders, ropes, or scaffolds, occasional climbing of ramps and stairs, balancing, stooping, crouching, kneeling, and crawling, and no concentrated exposure to extreme cold, extreme heat, humidity, pulmonary irritants, and hazards (Tr. 18).  Also as discussed above, the RFC assessment is supported by Dr. Anderson's opinion, the plaintiff's conservative treatment history, and the unremarkable physical findings described above.

Furthermore, the ALJ considered the plaintiff's testimony that her back and leg pain prevented her from walking or standing for even an hour and that she must elevate her feet throughout the day due to ankle swelling (Tr. 20).  The Fourth Circuit Court of

Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996). In *Hines v. Barnhart*, 453 F.3d 559 (4th Cir. 2006), a Fourth Circuit Court of Appeals panel held, "Having met his threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [the claimant] was entitled to rely exclusively on subjective evidence to prove the second part of the test, i.e., that his pain [was] so continuous and/or severe that it prevent[ed] him from working a full eight-hour day." 453 F.3d at 565. However, the court in *Hines* also acknowledged that "'[o]bjective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available should be obtained and considered.'" *Id.* at 564 (quoting SSR 90-1p, 1990 WL 300812).

> The court further acknowledged:
>
> While objective evidence is not mandatory at the second step of the test, "[t]his is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which

> that impairment can reasonably be expected to cause the pain
> the claimant alleges she suffers."

*Id*. at 565 n.3 (quoting *Craig*, 76 F.3d at 595). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005); 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2) ("We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled. However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."); SSR 96-7p, 1996 WL 374186, at *6 ("[T]he absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence.").

A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." 1996 WL 374186, at *4. Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Id.*

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

> (1)    the individual's daily activities;

20

(2)     the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)     factors that precipitate and aggravate the symptoms;

(4)     the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)     treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)     any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)     any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3.  *See* 20 C.F.R. §§ 404.1529(c), 416.929(c).

The ALJ found that while her impairments could reasonably be expected to cause her alleged symptoms, the plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely credible (Tr. 20).  The ALJ noted that the plaintiff had received only conservative treatment for her back pain; there was no objective evidence of significant peripheral neuropathy or edema; a lower extremity arterial exam in September 2011 revealed normal bilateral ankle brachia indices; the plaintiff had rather unremarkable examinations showing good range of motion, intact sensation, and normal strength in her upper and lower extremities; and the plaintiff received unemployment benefits after the alleged onset date, which required her to certify she was willing and able to engage in work activity (Tr. 20; *see* Tr. 18-19).  The undersigned finds that the  ALJ's credibility determination is based on substantial evidence and is without legal error.  *See Richwalski v. Colvin*, C.A. No. 6:13-132-MGL, 2014 WL 2614105, at *11 (D.S.C. June 9, 2014) (finding that "the ALJ properly considered the plaintiff's receipt of unemployment benefits as just one of several factors that informed his ultimate assessment

21

of the plaintiff's credibility"); *Brannon v. Astrue*, C.A. No. 1:11–1568–SVH, 2012 WL 3842572, at *11 (D.S.C. Sept.4, 2012) ("The ALJ noted Plaintiff's application for unemployment benefits as one of many factors impacting his credibility determination and at no point stated that the application barred Plaintiff's application for disability benefits."); *Elder v. Astrue*, C.A. No. 3:09-2365-JRM, 2010 WL 3980105, at *10 (D.S.C. Oct. 8, 2010) (ALJ's credibility finding supported in part by evidence that plaintiff applied for unemployment benefits).

## **CONCLUSION AND RECOMMENDATION**

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error.  Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

April 23, 2015
Greenville, South Carolina

22